IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AISSATOU CAMARA,

     Plaintiff,

 v.

EPPS AIR SERVICE, INC.,
d/b/a EPPS AVIATION,

     Defendant.

CIVIL ACTION FILE NO.

1:16-CV-04232-TWT-WEJ

## ORDER AND
## FINAL REPORT AND RECOMMENDATION

The perception that customers have of a business is critical to its success. In an effort to shape that perception in a positive way, some companies impose appearance policies on employees who interact with their customers. Defendant, Epps Air Service, Inc. ("Epps"), is one of those companies. Epps has a policy requiring its employees to present a neat, professional appearance, and as part of that policy, requires its customer service representatives ("CSR") to wear uniforms.

Plaintiff, Aissatou Camara, who formerly worked for Epps as a CSR and adheres to the Muslim faith, sought permission to wear a hijab at work. Epps denied her request because its owner believed that allowing a CSR to wear religious garb was inconsistent with the policy, did not project the image he

sought for his company, and could hurt its business, given some that some customers might have negative reactions.

However, to accommodate plaintiff's request to wear a hijab, Epps offered Ms. Camara a transfer to a non-frontline accounting position where she would not be required to wear a uniform and where she would receive the same pay, work hours, and benefits that she had received as a CSR. However, plaintiff rejected this transfer offer and insisted upon remaining a CSR. Epps then terminated Ms. Camara's employment.

Ms. Camara subsequently filed this action against Epps under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), alleging both religious discrimination and retaliatory discharge. (See Compl. [1] Counts I-IV.) This matter is before the Court on three motions: (1) Plaintiff's Motion for [Partial] Summary Judgment on Her Discharge (Count II) and Retaliation (Count IV) Claims [23]; (2) Defendant's Motion for Summary Judgment [26] on all of plaintiff's claims; and (3) Plaintiff's Motion to Exclude Paragraph 4 of Kelley Griffith's Affidavit [35]. For the reasons detailed below, the undersigned **RECOMMENDS** that Plaintiff's Motion [23] be **DENIED** and that Defendant's Motion [26] be **GRANTED**. Further, Plaintiff's Motion to Exclude Paragraph 4 of Kelley Griffith's Affidavit [35] is **DENIED AS MOOT**.

# I.   **STATEMENT OF FACTS**

To assist with framing the undisputed material facts, Local Rule 56.1 requires the filing of certain documents along with a summary judgment motion. Plaintiff Camara as movant on her Motion for Partial Summary Judgment filed a Statement of Undisputed Material Facts ("PSUMF") [23-2]. Epps submitted a response. (See Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ("DR-PSUMF") [27].) As allowed by the Local Rules, Epps submitted a Statement of Additional Undisputed Material Facts ("DSAF") [28], to which plaintiff filed a response. (See Pl.'s Resp. to Def.'s Statement of Add'l Undisputed Facts ("PR-DSAF") [32-1].)

The Court has used the parties' proposals as the basis for the statement of facts under the following conventions. When a party admits a proposed fact (in whole or in part), the Court accepts that fact (or the part admitted) as undisputed for the purposes of this R&R and cites only to the proposed fact. When a party denies a proposed fact (in whole or in part), the Court reviews the record cited and determines whether that denial is supported, and if it is, whether any fact dispute is material. The Court sometimes modifies a proposed fact per the opposing party's response or per the record cited to reflect the fact more accurately. The Court also includes some facts drawn from its review of the record, see Fed. R. Civ. P. 56(c)(3), excludes immaterial proposed facts, and

excludes proposed facts that are stated as issues or legal conclusions.  The parties sometimes propose facts which are nearly identical.  To avoid repetition, when the Court incorporates such facts, it cites to one proposed fact and employs a "<u>see also</u>" signal to the other(s).  The Court views all proposed facts in light of the standards for summary judgment set out <u>infra</u> Part III.  Finally, the Court rules on objections to proposed facts.  Although the Court prefers to explain its rulings, given the need for brevity, the Court sometimes sustains an objection for the reasons stated by the objecting party when it deems those reasons sufficient.  The Court's inclusion of a proposed fact to which an objection has been asserted implicitly overrules that objection.

### A.   <u>Epps Hires Plaintiff as a CSR</u>

When plaintiff originally interviewed for a position at Epps in 2003, she was made aware that the company had a dress code policy applicable to employees holding the CSR position.  (DSAF ¶ 18.)  In other words, plaintiff knew that she would be required to wear a uniform at the front desk as a CSR.  (<u>Id.</u> ¶ 19.)  Epps hired plaintiff as a CSR on September 30, 2003.  (<u>Id.</u> ¶ 21; <u>see also</u> PSUMF ¶ 3.)   As a CSR, plaintiff's job duties required her to have significant contact with defendant's customers, employees, vendors, and the public.  (PSUMF ¶ 5.)  With respect to whether interacting with defendant's customers was one of plaintiff's "material responsibilities," Patrick Epps, Sr.

(defendant's owner) explained: "Dealing with customers, certainly. They are usually the first person that the customer comes–after the line [in contact with] . . . ." (Id. ¶ 6.) The CSR's job description states that: "the CSR is the face of Epps Aviation. This person will welcome pilots, passengers, and guests" to the Company. (Id. ¶ 7.) The CSR's job description also makes numerous references to "customer interaction" as a primary function of the CSR position. (Id. ¶ 8.) Shane Dale, plaintiff's manager from 2009-2105 (DSAF ¶ 52), confirmed that customer interaction was a "material responsibility" and an "essential part" of the CSR's job duties. (PSUMF ¶ 9.) Mr. Dale further confirmed that plaintiff was a "valuable asset" to defendant's team; that she was well-liked by defendant's customers; and that she was "one of his best employees." (Id. ¶ 10; see also id. ¶ 29.)

### B.   **The Dress Policy**

The Company's Dress Policy is found in two places:  the Employee Handbook and in a one-page document provided to new employees. (Griffith Dep. [33-6] 64-67.) Because the policies are slightly different, the Court quotes both of their provisions below. The "Dress Code" in the Epps Aviation Policy Manual and Employee Handbook provides as follows:

> Business attire should be conducive to a professional business environment and enable the wearer to interact with customers, clients and fellow employees in a professional manner. Therefore, Epps

> employees are expected to present a neat, professional appearance at all times.
>
> Occasionally, casual days will be observed and announced in advance.  Appropriate dress for casual days should also be neat and professional in appearance.
>
> Some departments supply employees with uniforms that are to be worn when at work.  See your supervisor with any questions regarding the dress code.

(Pl.'s Ex. 7 [33-7], at 5.)  The one page "Dress Policy" given to new hires

provides as follows:

> Employees are expected to maintain the highest standards of personal hygiene and present a neat, professional appearance at all times.
>
> Our client's satisfaction represents the most important and challenging aspect of our business.  Whether or not your job responsibilities place you in direct client contact, you represent the Company with your appearance as well as your actions.  The properly attired employee helps to create a favorable image for the Company, to the public and fellow employees.
>
> Because it would be impossible to define every example of what is permitted and not permitted, it is the responsibility of employees and administrators to exercise good judgment when choosing clothing for office activities.  If you have to think twice about what you have on, it is probably not appropriate for work.

(Pl.'s Ex. 2 [23-7], at 1.)[1]

---

[1] Because the Court quotes the policies, facts proposed about them (see PSUMF ¶ 56) are excluded as immaterial.  The Court further excludes PSUMF ¶ 55 because it contains a legal conclusion.  See N.D. Ga. Civ. R. 56.1 B.(1)(c) ("The court will not consider any fact: . . . stated as an issue or legal

As referenced above, some departments at Epps require the employees who work in them to wear uniforms.  CSRs were required to wear uniforms.  There was a schedule for CSRs in 2015 wherein they had a specific uniform for each day of the week on a rotating schedule per season.  (DSAF ¶ 48.)  A typical weekly uniform schedule for CSRs is as follows:

| DAY | Mon. | Tues. | Wed. | Thurs. | Fri. | Sat. | Sun. |
|---|---|---|---|---|---|---|---|
| UNIFORM COLOR | BLACK BUTTON DOWN | BLUE STRIPE SHIRT | GREY POLKA DOTS | PURPLE STRIPE | BLUE EPPS | VEST W/ BLACK | VEST W/ WHITE |

(Pl.'s Ex. 6 [33-7], at 10.)[2]

## C.   Plaintiff's February 2015 Request to Wear a Hijab[3]

Epps was aware that plaintiff is of the Muslim faith.  (PSUMF ¶ 17, as modified by DR-PSUMF ¶ 17; see also PSUMF ¶ 1, DSAF ¶ 44.)  The parties do not dispute that, women who practice the Muslim faith are required to wear a

---

conclusion . . . .").  The Court further excludes PSUMF ¶¶ 48-49 as argumentative, because each contains a premise that is unsupported by the record cited.

[2] The above-quote uniform rotation was effective December 1, 2015, which was after plaintiff left Epps, but is representative of it.

[3] Plaintiff first requested and was denied permission to wear a hijab while working as a CSR in November 2013.  Because this date is more than 180 days before plaintiff filed her June 1, 2015 charge of discrimination [40-1] with the Equal Employment Opportunity Commission ("EEOC") (see PSUMF ¶ 63), any claim based upon that denial is untimely.  See United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977).  Thus, the Court excludes DSAF ¶¶ 22-24 and PSUMF ¶¶ 16, 18-21, 27-28 as immaterial.

head scarf, or hijab, when in public.  (PSUMF ¶ 2, as modified per DR-PSUMF ¶ 2.)[4]

In February 2015, plaintiff spoke to her manager (Mr. Dale) about her need to wear a hijab while at work as part of her religious practices and beliefs. (PSUMF ¶ 31.)  Mr. Dale responded by indicating, among other things, that he would present plaintiff's request to the owner, Mr. Epps.  (Id. ¶ 32.)  Mr. Dale and Kelly Griffith, defendant's Human Resources Director, instructed plaintiff to take a picture with her hijab on so that Mr. Epps "could see what she looked like with a Hijab."  (Id. ¶ 33.)[5]  A few days later, Mr. Dale informed plaintiff that Mr. Epps would not allow her to wear a hijab while working as a CSR.  (Id. ¶ 34.)

Mr. Epps testified that he was the one who made the decision that plaintiff could not wear a hijab in the CSR position.  (Epps Dep. [33-8] 18; see also

---

[4] The parties propose facts about why plaintiff did not wear a hijab at any workplace for many years preceding the event at issue here.  (See PSUMF ¶¶ 11-15, 30, 67-68; DSAF ¶¶ 1-17, 20.)  However, because the focus of this case is on plaintiff's request to wear a hijab in 2015, the fact that she had not worn one before is immaterial.  Moreover, given the standards governing summary judgment, the Court cannot determine whether plaintiff's religious beliefs are sincerely held, and assumes that they are for purposes of this Motion.  Thus, the Court excludes proposed facts (see DSAF ¶¶ 45-47) which challenge their sincerity.  Finally, because the Court does not consider paragraph 4 of the Affidavit of Kelley S. Griffith [27-2], plaintiff's Motion to Exclude [35] that paragraph is **DENIED AS MOOT**.

[5] Ms. Griffith testified that, although she took the picture of Ms. Camara on her telephone, she never showed it to Mr. Epps.  He knew what a hijab was. (Griffith Dep. [33-5] 35-36.)

PSUMF ¶ 22.)   According to Mr. Epps, Epps Aviation has required certain employees to wear uniforms since the founding of the business in 1965.  (Epps Dep. [33-8] 17.)  He believes that the wearing of a hijab was "not consistent with the image [he] want[s] at [his] business."  (Id. at 19.)  In other words, it was "not within the dress code that we have established."  (Id. at 20; see also id. at 21; Epps Dep. [33-9] 47.)  An employee with an appearance that is different from what is seen among employees at other airport terminals would be, in Mr. Epps's view, unprofessional.  (Epps Dep. [33-8] 20.)  Customers might have a problem seeing a CSR in a hijab because employees at airport terminals do not wear religious garb.  (Epps Dep. [33-9] 38.)  Thus, allowing plaintiff to wear a hijab could impact the business.  (Id. at 46.)  Mr. Epps summarized his decision-making like this:

> Primarily, I did not want to upset my uniform dress, my dress code. I have a dress code for the line, for the front counter, for the maintenance.  There is a dress code.  Everybody adheres to it, and it's what I want.

(Id. at 47.)  The Company could have lost business by plaintiff wearing a hijab at the front counter when no one else in the industry allowed it.  (Id. at 48-49.)  Mr. Epps conceded that negative stereotypes and perceptions about Muslims was a

factor in his decision.  (Id. at 52.)[6]  Both Mr. Dale and Ms. Griffith agreed that wearing a hijab at the front desk violated the dress code applicable to CSRs. (DSAF ¶ 53.)[7]

### D.    Plaintiff's Interest in an Accounting Department Job

On February 10, 2015, plaintiff learned that the accounts receivable employee in the accounting department at Epps had resigned.  (DSAF ¶ 25.) Plaintiff asked Ms. Griffith in Human Resources if she would consider her for the accounts receivable position.  (Id. ¶ 26.)  The same day that Ms. Griffith let plaintiff know that she was collecting resumes for the accounts receivable position, plaintiff either sent her resume to Ms. Griffith or asked Ms. Griffith to consider her resume on file for the position.  (Id. ¶ 27.)

---

[6] Plaintiff proposes a fact asserting that, "because he admittedly harbored negative stereotypes about Muslims, Mr. Epps refused to allow [her to wear a hijab]."  (PSUMF ¶ 26; see also id. ¶¶ 35-36, 59 (making similar assertions).) The Court sustains defendant's objections to these proposed facts because they do not fairly reflect the record cited.  (See DR-PSUMF ¶¶ 26, 35-36, 59.)  Given the context of his testimony, Mr. Epps was concerned that customers might harbor negative stereotypes about Muslims.  There is no evidence that Mr. Epps himself harbored such negative stereotypes.   His company employs persons of the Muslim faith, no one has ever heard Mr. Epps make any disparaging remarks about Muslims, and he had no problem with plaintiff wearing a hijab in a position that did not require a uniform.  (Id. and record cited therein.)

[7] Given the Court's summary of Mr. Epps's relevant testimony in the text preceding this note, the Court excludes PSUMF ¶¶ 23-25, 57-58, and 60 as duplicative.  The Court further excludes DSAF ¶¶ 42 and 51 as immaterial and DSAF ¶ 43 as duplicative of DSAF ¶ 53.

### E.   Plaintiff Contacts CAIR

After plaintiff was denied permission to wear a hijab, she contacted the Council on American-Islamic Relations (CAIR").  (PSUMF ¶ 37, as modified per DR-PSUMF ¶ 37.)  CAIR Georgia's President subsequently mailed two letters to Epps.[8]  The first letter, dated March 3, 2015, provides in relevant part as follows:

> Our office was recently contacted by an employee of Epps Aviation, Ms. Aissatou Cammara [sic], about a religious accommodation issue.  She explained that she has been denied her right to wear a religiously mandated head cover or hijab at work due to conflicts with the uniform policy.  We would like to inform you that employers are required to accommodate religious practices per the Civil Rights act.  We have included an employer's guide for Islamic religious practices that provides more information that may help.  I hope you can reconsider this matter and allow Ms. Cammara [sic] to wear her hijab at work.  She is a long term employee with Epps Aviation and really enjoys her job and the people she works with.

(Pl.'s Ex. 7 [23-11], at 1.)

### F.   Epps Offers Plaintiff a Job in Accounting

Human Resources Director Griffith testified that she talked with Mr. Epps about transferring plaintiff to the accounting department, and that she could wear a hijab in that department because those employees do not wear uniforms; Mr. Epps replied that he had no problem with her wearing a hijab in accounting.

---

[8] Because the Court quotes the relevant parts of these letters, facts proposed about them (see PSUMF ¶¶ 38-39) have been excluded.

(DSAF ¶ 49.)[9]  Thus, on March 17, 2015, Epps offered plaintiff the position of accounting assistant in the accounting department.  (Id. ¶ 28.)  Plaintiff was told at the time that she would receive the same salary, have the same hours, and receive the same benefits in the accounting assistant position that she was receiving in the CSR position.  (Id. ¶ 29.)  Plaintiff testified that she did not like that she would be "helping" the accounts payable employee in the accounting department because plaintiff had more seniority than her and more education in aviation related matters.  (Id. ¶ 30.)  When plaintiff inquired as to the status of the accounts receivable position, she was told that it required a full 40 hours per week rather than the 32 hours that she was currently working.  (Id. ¶ 31.)  Plaintiff did not tell Ms. Griffith that she was willing to work more hours or change her days in the accounts receivable position.  (Id. ¶ 32.)[10]  Ms. Griffith told plaintiff that she could wear a hijab as an accounting department employee.  (Id. ¶ 33.)  Plaintiff believed that the accounts receivable position would have been a promotion, but that the accounting assistant position where she would be helping an employee with less seniority than her was "unfair."  (Id. ¶ 34.)

———————————————

[9] Although plaintiff erroneously numbered her response to the above fact, she responds with only one word, "Disputed."  She cites no record evidence to support that denial.  (See PR-DSAF ¶ 50.)  Because DSAF ¶ 49 is supported by the record cited, the Court deems it admitted.

[10] Plaintiff does not dispute the above fact, but asserts that Ms. Griffith never asked her.  (PR-DSAF ¶ 32.)

### G.    CAIR's Second Letter

On April 1, 2015, CAIR Georgia's President sent a second letter to Epps which provides in relevant part as follows:

> I am following up on my letter of March 5 [sic].  I understand Ms. Camara is still being denied her religious accommodation rights and would like to meet with you to discuss this in more detail with the hope of resolving this issue.  I have included some information below from the EEOC website (EEOC.gov) that may help you understand the requirements of employers with respect to religious accommodation.

(Pl.'s Ex. 8 [23-12], at 1.)[11]  Epps received both letters from CAIR.  (PSUMF ¶ 40, as modified per DR-PSUMF ¶ 40.)

### H.    Events of April 13-14, 2015

After failing to get a response to either of CAIR's letters, on April 13, 2015, plaintiff informed her manager (Mr. Dale) that she could not continue disobeying her religious practice of wearing a hijab in public, and that she intended to wear a hijab to work the next day.  (PSUMF ¶ 41; see also DSAF ¶ 35.)  Plaintiff asked Mr. Dale to inform Mr. Epps of her intention to wear a hijab.  (PSUMF ¶ 42; see also DSAF ¶ 35.)  Mr. Dale replied that he would do so, and plaintiff testified that she did not ask him to communicate anything else to Mr. Epps.  (DSAF ¶ 36.)

---

[11] The letter contains excerpts from the "Religious Discrimination" page of the EEOC's website.  (See Pl.'s Ex. 8 [23-12], at 2 (referring to: https://www.eeoc.gov/laws/types/religion.cfm).)

The next day (April 14) Ms. Camara did not wear a hijab to work. (PSUMF ¶ 45; see also DSAF ¶ 37.)[12]  Mr. Dale reported back to plaintiff that he had relayed to Mr. Epps her intention to wear a hijab, but Mr. Epps had said that she could not do so.  (DSMF ¶ 38, as modified per record cited; see also PSUMF ¶ 46; Camara Dep. [30-2] 160.)  Plaintiff then told Mr. Dale to inform Mr. Epps that she was going to file a charge of religious discrimination with the EEOC. (PSUMF ¶ 42.)[13]

During the afternoon of April 14, Epps again offered plaintiff the accounting assistant position with the same hours, salary, and benefits she received as a CSR, but she responded that she did not like the job that she was offered.  (DSAF ¶ 39.)  At this point, Epps told plaintiff that she had the option of accepting the accounting position or she could resign.  (Id. ¶ 40; see also PSUMF ¶ 47 (stating that plaintiff's options were to accept the accounting assistant position or resign).)[14]  Plaintiff refused the accounting position she was offered

_____

[12] It is undisputed that plaintiff never wore a hijab while working as a CSR. (PSUMF ¶¶ 61-62, as modified per DR-PSUMF ¶¶ 61-62.)

[13] Defendant disputes the above proposed fact by citing testimony from Mr. Dale.  (See DR-PSUMF ¶ 42; see also DSAF ¶ 50.)  However, Mr. Dale conceded that Ms. Camara "might" have made this statement to him and he "could" have relayed it to Mr. Epps.  (See PSUMF ¶¶ 43-44.)

[14] Plaintiff also asserts that the accounting assistant position had "significantly reduced duties that did not involve customer engagement."  (See PSUMR ¶ 47, citing Camara Decl. [23-6] ¶ 21.)  The Court is unsure what

despite acknowledging being told that she no longer had a position at the front desk.  (DSAF ¶ 41.)[15]

When plaintiff insisted upon remaining in the CSR position and wearing a hijab, Epps terminated her employment.  (PSUMF ¶¶ 4, 50-52, 54 (as modified by record cited).)[16]  The Georgia Department of Labor DOL-800 form completed by Ms. Griffith regarding plaintiff's separation provides as follows:  "Terminated: Disruptive to workplace by refusing a lateral transfer to accommodate her religious beliefs.  Unwillingness to accept supervisor's decisions."  (Pl.'s Ex. 5 [33-7], at 9.)

---

"significantly reduced duties" means.  The job obviously had duties sufficient to occupy plaintiff's time or it would not have existed in a small, for-profit business. With regard to the assertion that she would have had no customer engagement in the accounting assistant position, since plaintiff never held the job, she lacks personal knowledge of its extent of customer engagement.  See Fed. R. Evid. 602. Ms. Griffith, who managed the accounting department and had personal knowledge, testified that someone holding the accounting assistance position would "sometimes" have customer interaction, although it would be "significantly less" than that of a CSR.  (Griffith Dep. [33-5] 13, 41, 43-44.)  In any event, for reasons made obvious infra, the amount of customer engagement is not a material fact dispute.

[15] Plaintiff's denial of the above fact (see PR-DSAF ¶ 41) is not supported by the record.

[16] The Court excludes PSUMF ¶ 53 as duplicative of DSUMF ¶ 52.  The Court further excludes facts proposed about the EEOC's handling of plaintiff's charge (see PSUMF ¶ 64) as immaterial.  The Court also excludes PSUMF ¶¶ 65-66 as immaterial because defendant does not assert that this action was untimely. However, plaintiff's EEOC charge [40-1] is material.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>See</u> Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." <u>Rice-Lamar v. City of Fort Lauderdale</u>, 232 F.3d 836, 840 (11th Cir. 2000) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324.  Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

If in response the non-moving party does not sufficiently support an essential element of his case as to which he bears the burden of proof, summary judgment is appropriate.  Rice-Lamar, 232 F.3d at 840.  "In determining whether genuine issues of material fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party."  Id. (citing Anderson, 477 U.S. at 255).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact but rather to determine whether there are any such issues to be tried.  Anderson, 477 U.S. at 251.  The applicable substantive law will identify those facts that are material.  Id. at 248.  Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment.  Id.  Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  For factual issues to be "genuine," they must have a real basis in the record.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  When the record as a whole could not lead a rational trier of fact to find for the non-movant, there is no "genuine issue for trial."  Id. at 587.  Cross-motions for summary judgment do not change the above standard.  Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007).  Rather, "a court must consider each

motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Warshauer v. Chao, No. 4:06-CV-0103-HLM, 2008 WL 2622799, at *24 (May 7, 2008) (internal citations and quotations omitted). "Both motions must be denied if there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles Alan Wright et al., Federal Practice & Procedure §2720 (3d ed. 2009).

## III.  ANALYSIS

Plaintiff makes the following religious discrimination claims: (1) failure to reasonably accommodate her religious beliefs (Compl. [1] Count I); (2) discriminatory discharge (id. Count II); attempted discriminatory job segregation (id. Count III); retaliatory discharge (id. Count IV); and disparate impact (id. Count V). Plaintiff seeks entry of partial summary judgment on her discriminatory discharge (Count II) and retaliatory discharge (Count IV) claims. Defendant seeks entry of summary judgment against all of plaintiff's claims. The Court addresses these claims below in the order alleged.

### A.  Failure to Accommodate Claim (Count I)

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment,

because of such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1).  Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."  Id. § 2000e(j).  An employer has a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship."  Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 75 (1977).

In religious accommodation cases, courts apply a burden-shifting framework akin to that articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Walden v. Ctrs. for Disease Control & Prevention, 669 F.3d 1277, 1293 (11th Cir. 2012).  Under this framework, the plaintiff must first establish a prima facie claim by presenting evidence sufficient to prove that (1) she held a sincere, bona fide religious belief that conflicted with an employment requirement; (2) she informed her employer of the belief and conflict; and (3) she was discharged for failing to comply with the conflicting employment requirement.  Dixon v. The Hallmark Cos., 627 F.3d 849 (11th Cir. 2010).

If the plaintiff establishes a prima facie case, the defendant must show either (1) that it offered the plaintiff a reasonable accommodation of her religious practices, or (2) that any accommodation of the plaintiff's practices would result

19

in undue hardship to the employer.  Mathewson v. Fla. Game & Fresh Water Fish Comm'n, 693 F. Supp. 1044, 1050 (M.D. Fla. 1988), aff'd sub nom. Mathewson v. Fla. Game & Freshwater Fish Comm'n, 871 F.2d 123 (11th Cir. 1989) (table decision).  A court does not address undue hardship if the employer offers reasonable accommodation.  See Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68-69 (1986) ("As Hardison illustrates, the extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.").[17]

The phrase "reasonably accommodate" is "not defined within the language of Title VII."  Beadle v. Hillsborough Cty. Sheriff's Dep't, 29 F.3d 589, 592 (11th Cir. 1994).  "Thus, the precise reach of the employer's obligation to its employee is unclear under the statute and must be determined on a case-by-case basis."  Id.  Nevertheless, the Supreme Court has held that a reasonable

---

[17] See also Morrissette-Brown v. Mobile Infirmary Med. Ctr., 506 F.3d 1317, 1324 n.7 (11th Cir. 2007) (because the district court found that the employer had reasonably accommodated the employee's religious practices, it was unnecessary to discuss the statute's "undue hardship" prong); Bruff v. N. Miss. Health Servs., Inc., 244 F.3d 495, 501 (5th Cir. 2001) ("Once the Medical Center establishes that it offered Bruff a reasonable accommodation, even if that alternative is not her preference, they have, as a matter of law, satisfied their obligation under Title VII."); George v. Home Depot, Inc., No. 00-2616, 2001 WL 1558315, at *6 (E.D. La. Dec. 6, 2001) ("As stated in Philbrook and Bruff, Home Depot need prove only that it offered George a reasonable accommodation to prevail on summary judgment."), aff'd, 51 F. App'x 482 (5th Cir. 2002) (per curiam).

accommodation is one that "eliminates the conflict between employment requirements and religious practices." <u>Philbrook</u>, 479 U.S. at 70. As the Eleventh Circuit has explained:

> [C]ompliance with Title VII does not require an employer to give an employee a choice among several accommodations; nor is the employer required to demonstrate that alternative accommodations proposed by the employee constitute undue hardship. Rather, the inquiry ends when an employer shows that a reasonable accommodation was afforded the employee, regardless of whether that accommodation is one which the employee suggested.

<u>Beadle</u>, 29 F.3d at 592 (internal citations omitted); <u>see also</u> <u>Walden</u>, 669 F.3d at 1294 ("'[A]ny reasonable accommodation by the employer is sufficient to meet its accommodation obligation.'") (quoting <u>Philbrook</u>, 479 U.S. at 68). As a practical matter, accommodation typically takes place in two ways: (1) changing the working conditions of the employee's current position, or (2) offering to let the employee transfer to another reasonably comparable position where conflicts are less likely. <u>See</u> <u>Bruff</u>, 244 F.3d at 500.

Once the employer offers reasonable accommodation, there is a concomitant duty on the employee to accept that offer. <u>See</u> <u>Beadle</u>, 29 F.3d at 593 ("While we recognize an employer's duty to reasonably accommodate the religious practices of its employee, we likewise recognize an employee's duty to make a good faith attempt to accommodate his religious needs through means offered by the employer."); <u>see also</u> <u>Matthewson</u>, 693 F. Supp. at 1050 (citing

Philbrook, 479 U.S. at 68, in recognition of the employee's duty of "bilateral cooperation" with the employer to reconcile his religious needs with the demands of the employer's business).

Plaintiff contends here that Epps violated its duty to reasonably accommodate her religious beliefs by not allowing her to wear a hijab while working as a CSR. However, the record shows that Epps offered plaintiff an accommodation—a transfer to an accounting assistant position with the same pay, benefits, and working hours she had enjoyed as a CSR, but which was not subject to the uniform policy and at which she could wear a hijab. Thus, the Court need not address undue hardship. Instead, the issue is whether this accommodation was reasonable.

The case law makes clear that this transfer offer was a reasonable accommodation. In Birdi v. UAL Corp., No. 99 C 5576, 2002 WL 471999 (N.D. Ill. Mar. 26, 2002), the plaintiff-employee, a Sikh, sued United Airlines for removing him from his position as a CSR based on his need to wear a turban for religious purposes. Id. at *1. United's uniform policy required that "[a]ll headgear must be removed when indoors." Id. United "attempted to accommodate [the employee] by offering him six alternative positions in which he could wear his [turban]." Id. The employee refused, claiming the proposed accommodations were unreasonable, primarily because four of the positions

offered would not have allowed him face-to-face customer contact, which was the main reason he took the original position.  Id. at *2.  The district court disagreed, concluding that United had fulfilled its accommodation obligation by offering the employee multiple alternative positions, one of which involved customer contact via telephone and two of which paid more than his current position.  Id.  The court noted that Title VII did "not require United to accommodate [the employee's] need for face-to-face customer contact"; rather, the company's efforts in offering multiple positions were sufficient to constitute reasonable accommodation.  Id.  Thus, an employer's transfer of a frontline employee whose religious expression conflicted with the company's appearance policy to a position that did not involve customer contact was a reasonable accommodation.[18]

A transfer offer is a reasonable accommodation even if the employee would earn less money in the new job.  See, e.g., Bruff, 244 F.3d at 502 n.23 (fact that non-counselor position offered to plaintiff would have required her to take "a significant reduction in salary" did not, standing alone, make the accommodation

_____

[18] Similarly, in Shelton v. University of Medicine & Dentistry of New Jersey, 223 F.3d 220 (3rd Cir. 2000), a state hospital's offer to transfer the plaintiff nurse to a newborn ICU was a reasonable accommodation to her religious beliefs, which prevented her from assisting in emergency procedures to terminate pregnancies, inasmuch as she would not be required to assist in the performance of abortions in the new job.  Id. at 226.

unreasonable); Cook v. Lindsay Olive Growers, 911 F.2d 233, 241 (9th Cir. 1990) (transfer of employee to avoid Sabbath work to position which paid less per hour was reasonable accommodation); Eversley v. MBank Dallas, 843 F.2d 172, 176 (5th Cir. 1988) (simply because the proposed accommodation was to a job with a lower pay rate did not make it unreasonable); Vaughn v. Waffle House, Inc., 263 F. Supp. 2d 1075, 1083 (N.D. Tex. 2003) (defendant reasonably accommodated plaintiff's request to be relieved of Sabbath work through transfer to a lower-paying job that did not require weekend work). A transfer offer is a reasonable accommodation even if the employee might temporarily lose seniority privileges. See Cosme v. Henderson, 287 F.3d 152, 160 (2d Cir. 2002).[19]

Finally, even a layoff can constitute a reasonable accommodation. In the Eleventh Circuit's Walden decision, the plaintiff worked for Computer Sciences Corporation ("CSC"), which administered and staffed an Employee Assistance Program for the Centers for Disease Control ("CDC"). In the course of counseling a CDC employee, plaintiff disclosed that she had a bona fide religious belief which prevented her from providing relationship counseling to same-sex couples. Because the CDC perceived that Ms. Walden had reacted negatively to

---

[19] Plaintiff argues that the proposed transfer, which she claims was a "demotion," was an adverse employment action. (See Pl.'s Mem. [23-1] 22 n.12; see also Pl.'s Resp. [34] 14-15.) However, the cases she cites in support of that argument are inapposite because they do not deal with the issue here, i.e., whether the offer of a transfer was a reasonable accommodation.

an employee's request for same-sex relationship counseling, the CDC demanded that CSC remove Ms. Walden from working under the CDC/CSC contract. CSC complied, and subsequently laid off Ms. Walden because it had no counseling positions available in the Atlanta area. The court held that CSC had reasonably accommodated Ms. Walden when it laid her off, encouraged her to obtain new employment with the company, and offered her assistance to do so. Because of Ms. Walden's laid-off status, she would have retained her tenure had CSC rehired her within a year. Although other positions were available, Ms. Walden did not apply for any of them. 669 F.3d at 1293-95. According to the Circuit,

> Ms. Walden's claim that CSC should have instead considered "the most obvious accommodation—transfer to a non-counseling position," Aplt. Br. at 40, is of no relevance here. CSC was only obligated to offer her some reasonable accommodation. It was not required to provide Ms. Walden with her preferred accommodation. . . . By giving Ms. Walden the opportunity to remain employed with the company, instead of simply terminating her as an at-will employee refusing to fulfill her job responsibilities, CSC provided a reasonable accommodation to Ms. Walden.

Walden, 669 F.3d at 1294 (citation and internal quotation marks omitted).[20]

_____

[20] Similarly, in Bruff, 244 F.3d at 501-03, the court held that the defendant hospital fulfilled its obligation to accommodate the plaintiff-counselor's religiously-based refusal to provide same-sex relationship counseling when it laid her off, gave her thirty days to find another position at the hospital, and provided her with the assistance of its in-house employment counselor.

The cases discussed above show that transfers to jobs of a different nature, transfers to lower-paying jobs, and even layoffs are reasonable accommodations. Given these cases, Epps's offer to transfer plaintiff to a job with the same pay, hours, and benefits that she currently enjoyed constitutes a reasonable accommodation. Although the duties assigned were of a different nature, the job was reasonably comparable. Once Epps offered plaintiff the accounting position where she could wear a hijab and end any conflict between her religious beliefs and defendant's uniform policy, Epps met its reasonable accommodation obligation.

At this point, Ms. Camara had a duty to accept Epps's offer. See Beadle, 29 F.3d at 593 ("While we recognize an employer's duty to reasonably accommodate the religious practices of its employee, we likewise recognize an employee's duty to make a good faith attempt to accommodate [her] religious needs through means offered by the employer."). Ms. Camara's main disagreement with the transfer appeared to be her perception that the accounting assistant position was "beneath" her and that it would not give her any customer engagement. As already discussed, it is undisputed that plaintiff would have had customer engagement in the accounting assistant position, although not as much as she had as a CSR. It is also undisputed that plaintiff had sought the accounts

receivable position, which also had less customer engagement than the CSR position. Thus, customer engagement was obviously not that important to her.[21]

Plaintiff's apparent preference for a job that was more in line with what she perceived her status to be is immaterial. If she wanted to wear a hijab at work, plaintiff had a duty to accept the transfer offer, but she did not. Despite Epps's best efforts, accommodation was impossible where the employee unreasonably refused to accept the alternative opportunity provided. The Sixth Circuit's analysis of this issue is helpful here:

> An employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts. Nor can he thereby shift all responsibility for accommodation to his employer. Where an employee refuses to attempt to accommodate his own beliefs or to cooperate with his employer's attempt to reach a reasonable accommodation, he may render an accommodation impossible.

Smith v. Pyro Mining Co., 827 F.2d 1081, 1085 (6th Cir. 1987) (citation and quotation marks omitted).

After plaintiff raised the conflict between the uniform she was required to wear as a CSR and the mandate of her faith that she wear a hijab, Epps offered a reasonable accommodation which eliminated that conflict. However, plaintiff

---

[21] Plaintiff also argues that the accounting assistant had no identifiable career growth track. (Pl.'s Resp. [34] 17.) Plaintiff had been a CSR for twelve years. She apparently was not that concerned about a career growth track.

refused a transfer to a reasonably comparable position.  By unreasonably refusing the transfer, plaintiff left Epps no choice but to terminate her employment.  Based upon these undisputed facts, because Epps met its obligations under Title VII, defendant is entitled to summary judgment on plaintiff's failure to accommodate claim (Count I).

As discussed above, once Epps offered a reasonable accommodation, the analysis ends and there is no need to address undue hardship.  See Philbrook, 479 U.S. at 70; see also EEOC v. Bridgestone/Firestone, Inc., 95 F. Supp. 2d 913, 928 (C.D. Ill. 2000) (once the employer makes that showing that if offered a reasonable accommodation, the statutory inquiry is at an end and the court is not required to address the issue of undue hardship).  Nevertheless, in the event that the district judge disagrees with the above recommendation, the undersigned touches briefly on undue hardship.  See Hardison, 432 U.S. at 75 (defining "undue hardship" as any act that would require an employer to bear greater than a "de minimis cost" in accommodating an employee's religious beliefs).[22]

_____

[22] That the Court set the bar low is apparent from its use of the term "de minimis."  Black's Law Dictionary defines that term to mean "trifling," "negligible," and "so insignificant that a court may overlook it in deciding an issue or case."  See Black's Law Dictionary 524 (10th ed. 2014).  In court decisions, "de minimis" is characterized as "not a heavy burden" (see Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp., No. 10-CV-1894(JG)(JO), 2012 WL 3288234, at *4 (E.D.N.Y. Aug. 10, 2012)); "minimal" (see Faul v. Potter, 355 F. App'x 527, 528 (2d Cir. 2009)); "very low" (see Cannon v. Burkybile, No. 99 C

The Court first notes that what plaintiff actually wants is not an accommodation, but rather an exemption from Epps's appearance policy. The case law provides, however, that an employer is not required to exempt an employee from an appearance policy because to do so would constitute undue hardship. The First Circuit addressed this issue in a case brought by an employee who asserted that her religious beliefs as part of the Church of Body Modification required her to display facial piercings:

> [W]e are faced with the similar situation of an employee who will accept no accommodation short of an outright exemption from a neutral dress code. Granting such an exemption would be an undue hardship because it would adversely affect the employer's public image. Costco has made a determination that facial piercings, aside from earrings, detract from the "neat, clean and professional image" that it aims to cultivate. Such a business determination is within its discretion. As another court has explained, "Even assuming that the defendants' justification for the grooming standards amounted to nothing more than an appeal to customer preference, . . . it is not the law that customer preference is an insufficient justification as a matter of law."

Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 136 (1st Cir. 2004) (citations omitted).

---

4623, 2002 WL 448988, at *9 (N.D. Ill. Mar. 22, 2002)); "extremely low" (see Franklin v. Astrue, No. C11-1615-MJP-MAT, 2012 WL 3059407, at *2 (W.D. Wash. July 25, 2012)); and "neither onerous, nor intended to be rigid, mechanized or ritualistic" (see Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted)).

Likewise, in <u>Equal Employment Opportunity Commission v. Sambo's of Georgia, Inc.</u>, 530 F. Supp. 86 (N.D. Ga. 1981), in a suit filed on behalf of a practicing Sikh (Mohan Singh Tucker), the EEOC claimed that the Sambo's restaurant chain violated Title VII when it refused to hire Mr. Tucker unless he shaved his beard, which was contrary to his religious beliefs.  This Court ruled in favor of the employer, finding that Sambo's grooming policy, forbidding its restaurant employees from wearing facial hair, with the exception of neatly-trimmed mustaches, had been uniformly applied in all of its restaurants and complied with the public image that Sambo's had built up over the years.  <u>Id.</u> at 89.  This Court also found that those grooming standards were based on management's "perception and experience" that a significant segment of the consuming public in the market Sambo's served preferred clean-shaven restaurant employees.  <u>Id.</u>  Thus, customer preference was a legitimate reason for upholding the company's grooming policy.  <u>Id.</u>  Further, this Court noted that excessive facial hair could be a sanitation issue, and to avoid having to police the length of each male employee's beard and risk being penalized by public health inspectors if it failed, Sambo's was within its rights to ban facial hair.  <u>Id.</u> at 90.  With regard to facts related to undue hardship, this Court stated as follows:

> The evidence shows that relaxation of Sambo's grooming standards
> as to facial hair on restaurant managers-or exceptions from those
> standards-would impose an undue hardship on Sambo's in that doing
> so would adversely affect Sambo's public image and the operation of

the affected restaurant or restaurants as a consequence of offending certain customers and diminishing the "clean cut" image of the restaurant and its personnel; would impose on Sambo's a risk of noncompliance with sanitation regulations that is avoided under the current policy; and would make more difficult the enforcement of grooming standards as to other restaurant employees and the maintenance of employee morale and efficiency.  The Court finds that this hardship would be a significant cost to Sambo's Restaurants that is more than merely de minimis.

Id.  This Court concluded its review of the facts by stating that the EEOC's demand that Sambo's accommodate Mr. Tucker by permitting him to have a beard while serving as a restaurant manager "is not a demand for accommodation but a demand for outright exemption."  Id.

The undersigned follows Cloutier and Sambo's and reports that, if the district judge finds that Epps's transfer offer was not a reasonable accommodation, then a relaxation of Epps's dress policy—or granting an exemption from those standards—would impose an undue hardship on Epps in that doing so would adversely affect the image that it seeks to present to the public through a uniform policy and potentially cost it business if some customers go elsewhere.  This hardship would be at a cost to Epps that is more than de minimis.  Accordingly, summary judgment should be entered for Epps on this alternative ground on plaintiff's failure to accommodate claim.[23]

---

[23] There are cases that have rejected an employer's claim that permitting the employee to wear a head covering in violation of its dress code imposed an

31

## B.   <u>Discriminatory Discharge Claim (Count II)</u>

Whether an employer intentionally discriminated against an employee is a question of fact, which may be proved either through direct or circumstantial evidence.  <u>Hamilton v. Southland Christian Sch., Inc.</u>, 680 F.3d 1316, 1320 (11th Cir. 2012).  "Direct evidence of discrimination is 'evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee' and 'that, if believed, proves the existence of a fact in issue without inference or presumption.'"  <u>Id.</u> (quoting <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1086 (11th Cir. 2004)). "Therefore, 'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor' constitute direct evidence of discrimination.'"  <u>Akouri v. Fla.  Dep't of Transp.</u>, 408 F.3d 1338, 1347 (11th Cir. 2005) (quoting <u>Rojas v. Florida</u>, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (per curiam)).

---

undue hardship.  <u>See, e.g.</u>, <u>EEOC v. Alamo Rent-a-Car, LLC</u>, 432 F. Supp. 2d 1006 (D. Ariz. 2006).  The court there had to address the undue hardship issue because Alamo had not provided a reasonable accommodation.  Specifically, the employer's decision to allow the employee to wear the head covering while working in the back office but to remove it when working at the rental counter in customer view, did not resolve the conflict between the dress code and employee's religious practice.  <u>Id.</u> at 1013.  As discussed <u>supra</u>, Epps offered a reasonable accommodation to Ms. Camara.

Plaintiff contends that she has presented direct evidence of religious discrimination and retaliation.[24]  (Pl.'s Mem. [23-1] 15-17.)  The testimony that plaintiff cites and the wording of the Georgia DOL separation notice Epps provided to her do not constitute direct evidence.  As already discussed, plaintiff misconstrues the record when she claims that Mr. Epps admitted that negative stereotypes that <u>he</u> held about Muslims led him to make the decision not to allow plaintiff to wear a hijab as a CSR.  Instead, he was concerned about what his customers might think (see <u>Cloutier</u>, 390 F.3d at 136 ("it is not the law that customer preference is an insufficient justification") (internal quotations marks and citation omitted)), and he did not believe that variations from the uniform would project a professional image.  Moreover, the fact that defendant's manager (Mr. Dale) conceded that plaintiff would still be working at Epps as a CSR if she had not insisted on wearing a hijab is not direct evidence of discrimination.  The undisputed fact is that Epps sought to retain plaintiff and offered her a reasonably comparable job where she could wear a hijab.  Her decision to reject the offer of reasonable accommodation led to her discharge.  Plaintiff's refusal to accept the transfer, and not plaintiff's religion, was the reason for the termination.

_____

[24] The Court considers the retaliation claim <u>infra.</u>  However, the analysis in the text following this note regarding direct evidence applies to both claims.

Plaintiff next asserts that she has circumstantial evidence of discriminatory intent using the McDonnell Douglas burden-shifting framework. (See Pl.'s Mem. [23-1], at 18-22.)[25] To establish a prima facie case of discriminatory termination under that framework, the plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her job; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly-situated employees outside her class more favorably or replaced her with someone outside her protected class. MackMuhammad v. Cagle's Inc., 379 F. App'x 801, 804 (11th Cir. 2010) (per curiam).

If the plaintiff establishes a prima facie case, the defendant need only produce evidence that there is a legitimate, non-discriminatory reason for the challenged employment action. Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002). If the employer carries this light burden, the presumption of discrimination is rebutted and the employer is entitled to summary judgment unless the plaintiff proffers evidence sufficient to create a genuine issue of

---

[25] A plaintiff may also show that a "triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" Smith v. Lockheed–Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Id. (quoting Silverman v. Bd. of Ed. of Chi., 637 F.3d 729, 733 (7th Cir. 2011) (footnote omitted)). Plaintiff has not argued Smith's "convincing mosaic" here.

material fact that discrimination was actually the reason for the challenged action. Id.; see also Cooper v. So. Co., 390 F.3d 695, 725 (11th Cir. 2004) (plaintiff must then come forward with evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision).

With regard to plaintiff's prima facie case, Ms. Camara (1) is a member of a protected class, and (2) was qualified for the job of CSR. However, the undersigned concludes that, although plaintiff lost her job, she did not suffer an adverse employment action—element (3)—in the usual sense. She could have retained her employment at Epps and worn a hijab at work had she accepted the reasonable accommodation offered to her. But, she refused it. Plaintiff's rejection of that offer left Epps no choice but to terminate her employment because it had no obligation to allow her to remain as a CSR if she insisted on wearing a hijab in violation of its dress code.

The dilemma that Epps faced here is similar to what occurred in Wiley v. Pless Security, Inc., No. 1:05-CV-332-TWT, 2006 WL 1982886 (N.D. Ga. July 12, 2006). In that case, the employer had removed plaintiff from a job site following, inter alia, complaints that her wearing of a hijab disturbed people at that site. Id. at 1. The employer offered that plaintiff a transfer to another site. Id. This Court considered the defendant's objection to the Magistrate Judge's

conclusion that the plaintiff there had suffered an adverse employment action and

concluded as follows:

> [T]he Defendant argues that the Plaintiff did not have an adverse
> employment action.  The Plaintiff abandoned her job when she was
> told that she would be transferred. . . .  Whether you call it a transfer,
> a demotion, or whatever, the *potential* adverse employment action
> never occurred because the Plaintiff quit first.  This is fatal to the
> Plaintiff's disparate treatment claim and her failure to accommodate
> claim.

Id.  Thus, the Court declined to adopt the Magistrate Judge's conclusion that

plaintiff had suffered an adverse employment action.  Id.

While the instant case is different from Wiley in that Ms. Camara did not

quit, she effectively did so, because she left Epps no choice but to terminate her

employment when she refused the transfer offer.  Cf. Chrysler Corp. v. Mann,

561 F.2d 1282, 1285 (8th Cir. 1977) ("Where an employee refuses to attempt to

accommodate his own beliefs or to cooperate with his employer's attempt to

reach a reasonable accommodation, . . . the employee himself is responsible for

any failure of accommodation and his employer should not be held liable for such

failure."); Bridgestone/Firestone, Inc., 95 F. Supp. 2d at 928 (employer should not

be held liable for plaintiff's failure to cooperate with effort to accommodate).

Like the employers in Mann and Bridgestone, Epps should not be held

responsible for discriminatory discharge when the only reason for that discharge

was the plaintiff's intransigence.

36

As for the fourth prima facie factor, plaintiff presents no facts in PSUMF which show that she was replaced by someone outside her protected class.[26] Plaintiff cites the Dale and Griffith depositions in a brief to support her claim that she was replaced by a non-Muslim.  (See Pl.'s Reply Br. [32] 6 n.2.)  However, the Local Rules prohibit this Court from considering any "fact: . . . set out only in the brief and not in the movant's statement of undisputed facts."  See N.D. Ga. Civ. R. 56.1 B.(1)(d).

In sum, plaintiff has failed to establish two elements of her prima facie discriminatory discharge case.  Therefore, the analysis could end here.  See Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 (11th Cir. 1998) ("summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a *prima facie* case").

Nevertheless, the undersigned continues the analysis to provide a complete Report.  Defendant has provided a legitimate, non-discriminatory reason for the challenged employment action—plaintiff refused the reasonable accommodation transfer offered to her, leaving Epps no choice but to terminate her employment. Plaintiff has submitted no probative evidence showing that this reason is

---

[26] With regard to the alternative branch of the fourth prima facie factor, plaintiff presents no evidence that Epps treated similarly-situated employees outside her class more favorably.

pretextual and that her religion was the reason for the discharge.  It is true that

Epps did not want plaintiff wearing religious garb as a CSR, but that is not

evidence that Epps fired her because of her religion.[27]  The undisputed evidence

is that Epps fired her because she refused to accept the reasonable

accommodation offered, and Epps could legitimately insist that she not wear a

hijab as a CSR.[28]

_____

[27] Plaintiff asserts multiple times that the DOL separation notice Epps
provided to her shows that she was terminated because of her religion.  As quoted
supra, the notice states:  "Terminated:  Disruptive to workplace by refusing a
lateral transfer to accommodate her religious beliefs.  Unwillingness to accept
supervisor's decisions."  (Pl.'s Ex. 5 [33-7], at 9.)  The Court is unwilling to find
that an employee's rejection of her employer's attempt to accommodate her
religious beliefs is evidence of intentional discrimination.  Moreover, while the
use of the word "disruptive" in the DOL separation notice was perhaps ill-advised
(because Ms. Camara acted professionally at all times), use of that one word does
not show that defendant has failed to articulate consistently the legitimate, non-
discriminatory reasons for plaintiff's discharge.  (See Pl.'s Reply Br. [32] 11.)  In
fact, the reasons offered in the DOL separation notice are consistent with what
Epps has argued here.

[28] Plaintiff argues that Epps disparately applied its dress code because it
granted exceptions for non-religious purposes but refused exceptions for religious
purposes.  (Pl.'s Resp. Br. [34] 13-14.)  Ms. Camara testified that she sometimes
wore a long-sleeve blouse that was the same color as the short-sleeve uniform
shirt required for the day.  (Camara Dep. [30-2] 110.)  Mr. Dale testified that the
only exception to the dress code of which he was aware was that Epps allowed
CSRs to wear something over the uniform to keep them warm in cold weather.
(Dale Dep. [33-1] 34-35.)  However, because plaintiff did not propose facts about
any exceptions to the dress code in PSUMF, the Court cannot consider them.
(See N.D. Ga. Civ. R. 56.1 B.(1)(d), quoted supra).  But, even if these claimed
exceptions could be considered, the Court fails to see how they show disparate
application of the policy.

For all the reasons stated above, the undersigned reports that plaintiff was not treated differently because of her religion.  Therefore, the undersigned recommends that plaintiff's Motion for Partial Summary Judgment on her discriminatory discharge claim (Count II) be **DENIED**, and that defendant's Motion for Summary Judgment on plaintiff's discriminatory discharge claim (Count II) be **GRANTED**.[29]

### C.    Attempted Job Segregation (Count III)

In Count III of the Complaint, plaintiff alleges that Epps engaged in religious discrimination when, in response to her request for accommodation, it subjected her to job segregation by "attempt[ing] to place her in a non-customer facing position based on negative stereotypes o[r] fears about Muslims."  (Compl. [1], at ¶ 90 (emphasis added).)

_____

[29] Plaintiff raises for the first time in response to defendant's Motion for Summary Judgment a "constructive discharge" claim, arguing that Epps forced her to resign.  (See Pl.'s Resp. [34] 18-21.)  No such claim was alleged in the Complaint [1], and a plaintiff cannot amend in response to a motion for summary judgment.  See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1313 (11th Cir. 2004) (per curiam).  Thus, the Court does not consider a constructive discharge claim here.  In any event, the undisputed material facts do not support such a claim.  See Cobb v. City of Roswell, Ga. ex rel. Wood, 533 F. App'x 888, 897 (11th Cir. 2013) (per curiam) ("Constructive discharge occurs when an employer deliberately makes working conditions intolerable, thereby forcing the employee to quit his job."); Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009) ("Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim.").

Perhaps because this claim seemed irrelevant given what discovery revealed (i.e., that plaintiff never accepted the transfer to accounting, and even if she had, she would have had contact with both other employees and customers), defendant did not specifically seek summary judgment on Count III. Nevertheless, because the undersigned does not wish to send meritless claims to trial, the Court addresses it now.

There is no evidence that Epps sought to segregate plaintiff on the basis of her religion.  But, even assuming that Epps's transfer offer was an attempt to do so, plaintiff rejected it.  The undersigned's research has uncovered no case where a court has held that an <u>unsuccessful</u> attempt to segregate an employee on the basis of her religion is actionable under Title VII.  Therefore, the undersigned **RECOMMENDS** that summary judgment be entered for defendant on plaintiff's attempted job segregation claim (Count III).

### D.    Retaliatory Discharge Claim (Count IV)

Title VII prohibits employer retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."  42 U.S.C. § 2000e–3(a). The first clause of the above-quoted anti-retaliation provision is known as the "opposition" clause, while the second clause is known as the "participation"

40

clause.  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1350 (11th Cir. 1999).

Because no EEOC charge or investigation had occurred at the time Ms. Camara's

employment ended, a retaliation claim arises (if at all) under the opposition clause.

To prevail on a Title VII retaliation claim, an employee must prove that (1)

she engaged in conduct protected by the retaliation provision, (2) she suffered a

materially adverse employment action, and (3) there was a causal relationship

between the two.  See Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1258

(11th Cir. 2012).  The relationship required by the third prong is "but-for"

causation.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, ___ U.S. ___, 133 S. Ct. 2517,

2534 (2013).  "That is, the employee must show that he would not have suffered

the adverse action if he had not engaged in the protected conduct."  Long v. Ala.

Dep't of Human Res., 650 F. App'x 957, 967 (11th Cir. 2016).

In this case, plaintiff engaged in conduct protected by the retaliation

provision when she requested to wear a hijab in February 2015 and contacted

CAIR, which sent a letter dated March 3, 2015 advocating for reasonable

accommodation.  Thereafter, on March 17, 2015, Epps offered plaintiff the

position of accounting assistant as a reasonable accommodation.  Plaintiff also

suffered an adverse employment action when she lost her job on April 14, 2015

(although, as already discussed in the discriminatory discharge analysis, this was

not an adverse employment action in the usual sense).

However, plaintiff cannot establish the third element of her prima facie case, i.e., that there was a causal relationship between her protected activity and her discharge.  Specifically, as already discussed at length, plaintiff's employment was not terminated in retaliation for requesting a reasonable accommodation or for threatening to file an EEOC charge.  Instead, Epps discharged plaintiff only after she refused the reasonable accommodation offered to her and insisted on remaining a CSR and wearing a hijab in violation of the dress code.[30]  Therefore, the undersigned **RECOMENDS** that Plaintiff's Motion for Partial Summary Judgment on her Retaliation Claim (Count IV) be **DENIED**, and that defendant's Motion for Summary Judgment be **GRANTED** with regard to plaintiff's retaliation claim, given her failure to establish a prima facie case.[31]

---

[30] Had Epps discharged plaintiff without first offering her a reasonable accommodation, then the close temporal proximity between her protected activity and her discharge might help establish this element of her prima facie case.  (See Pl.'s Mem. [23-1] 24.)   However, Ms. Camara's rejection of the offer of reasonable accommodation broke any causal connection.  Cf. Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 521 (11th Cir. 2007) (per curiam) (plaintiff's failure to meet the performance standards set by the employer broke the causal connection (if any) between the protected activity and her eventual termination).

[31] Because plaintiff failed to establish all elements of her prima facie case, the Court need not address defendant's burden of production or plaintiff's proof regarding pretext.  See Turlington, 135 F.3d at 1433.

### E.    Disparate Impact Claim (Count V)

Plaintiff alleges that defendant's dress code has a disparate impact on Muslim-Americans by having the disproportionate negative effect of precluding them from practicing their religious faith by wearing a hijab while at work.[32]  Ms. Camara contends that, as applied, no Muslim-American could practice her religion and work in any position that requires contact with defendant's customers. (Compl. [1] ¶ 109.)  Plaintiff further alleges that defendant's dress code is neither job related nor consistent with business necessity.  (Id. ¶ 110.)  Further, to the extent that defendant can make a showing of job-relatedness or business necessity, plaintiff contends that defendant refused to adopt an alternative practice with a less discriminatory effect on Muslim-Americans.  (Id.)

Title VII authorizes two causes of action against employers:  disparate treatment (intentional discrimination) and disparate impact.  EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. __, 135 S. Ct. 2028, 2032 (2015).  Although they are similar in their objectives, each cause of action has different elements.  A disparate treatment claim requires proof of discriminatory motive, "although [that impermissible motive] can in some situations be inferred from the

---

[32] The Court assumes that plaintiff meant to allege that female Muslim-Americans were disproportionately affected by the dress code because only women wear hijabs.  (See Def.'s Ex. 1, Employer's Guide to Islamic Religious Practices [30-3], at 7.)

mere fact of differences in treatment." <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 335 n.15 (1977).  A disparate impact claim, in contrast, does not require proof of discriminatory motive.  <u>Id.</u>  Instead, disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  <u>Id.</u>  "Thus, the factual allegations required to plead disparate treatment discrimination differ from those required for disparate impact discrimination."  <u>Boyd v. Miller Pipeline Corp.</u>, No. 3:16-CV-00278, 2017 WL 2990292, at *4 (W.D.N.C. July 13, 2017).

Although plaintiff alleged a disparate impact claim in the Complaint, summary judgment must be entered against it because she failed to exhaust administrative remedies regarding that claim.  Every employee who intends to sue for discrimination must first file an administrative charge with the EEOC.  <u>See</u> <u>Bost v. Fed. Express Corp.</u>, 372 F.3d 1233, 1239 (11th Cir. 2004).  "The filing of a charge of discrimination with the EEOC initiates 'an integrated, multi-step enforcement procedure' that enables the EEOC to detect and remedy various discriminatory employment practices."  <u>Id.</u> at 1238 (quoting <u>EEOC v. Shell Oil Co.</u>, 466 U.S. 54, 62 (1984)).  This multi-step process includes "(1) prompt notice from the EEOC to the employer that a charge has been filed; and (2) investigation of the charge by the EEOC."  <u>Id.</u> at 1239.  The purpose of requiring litigants to

first exhaust these administrative remedies is that the EEOC should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts.  Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004) (per curiam).

As a result, a plaintiff's judicial complaint is limited by the allegations of her charge of discrimination or by "the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Gregory, 355 F.3d at 1280 (quoting Alexander v. Fulton Cty., 207 F.3d 1303, 1332 (11th Cir. 2000)); see also Green v. Elixir Indus., Inc., 407 F.3d 1163, 1168 (11th Cir. 2005) ("The proper inquiry, as these cases make clear, is whether the complaint is 'like or related to, or grew out of' the allegations in the EEOC charge.").  Although courts allow claims in litigation that "amplify, clarify, or more clearly focus" allegations in the EEOC charge, Gregory, 355 F.3d at 1279-80, claims of discrimination not alleged in a charge are not permitted.  Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir. 1989).

Review of plaintiff's EEOC charge [40-1] shows that she alleged only disparate treatment.  She failed to alleged any facts related to the claimed disparate impact of Epps's dress code.  In similar situation, courts dismiss judicial complaints alleging disparate impact where the EEOC charge alleged only

disparate treatment.[33]  See Abdus-Shahid v. Mayor & City Council of Balt., 674 F. App'x 267, 276 (4th Cir. 2017) (per curiam) (affirming dismissal of an employee's claims against his employer because his EEOC charge alleged facts consistent with a disparate treatment claim, while his complaint asserted a disparate impact claim); see also Burgis v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 71 (2d Cir. 2015) (affirming dismissal of disparate impact claim for failure to exhaust where the EEOC charge "complain[ed] of individualized disparate treatment" only); Pacheco v. Mineta, 448 F.3d 783, 792 (5th Cir. 2006) (concluding plaintiff failed to exhaust remedies as to a disparate impact claim where the EEOC charge "facially alleged disparate treatment," "identified no neutral employment policy," and "complained of past incidents of disparate treatment only"); Boyd, 2017 WL 2990292, at *5 (dismissing disparate impact claim because EEOC charge alleged facts only suggesting disparate treatment).[34] Accordingly, the undersigned recommends that summary judgment be entered

---

[33] Defendant's Motion for Summary Judgment did not specifically address plaintiff's disparate impact claim.  Nevertheless, Epps asserted plaintiff's failure to exhaust administrative remedies in its Answer (see Answer [6] ¶ 118, Second Defense.)  Moreover, Epps made the same assertion in an addendum to the Joint Preliminary Report and Discovery Plan.  (See Attach. A [12-1].)

[34] Although courts are reluctant to erect needless procedural roadblocks upon lay persons filing charges with the EEOC, cf. Gupta v. E. Tex. State Univ., 654 F.2d 411, 414 (5th Cir. 1981), the charge [40-1] reflects that counsel represented Ms. Camara before that agency.

against plaintiff's disparate impact claim because her EEOC charge alleged only disparate treatment.

But, even if plaintiff had alleged facts regarding disparate impact in her EEOC charge, the record is devoid of any evidence showing that Epps's dress code had a disparate impact upon Muslim women. "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 575 (2d Cir. 2003). To establish a prima facie disparate impact claim, a plaintiff must show a statistically significant disparity in the treatment of two groups. Id. at 576; see also Ricci v. DeStefano, 557 U.S. 557, 587 (2009) (explaining that "a prima facie case of disparate-impact liability [is] essentially[] a threshold showing of a significant statistical disparity and nothing more" (internal citation omitted)). This is frequently proved through statistics, see Tsombanidis, 352 F.3d at 576, but not always. See Craig v. Ala. State Univ., 804 F.2d 682, 687 n.7 (11th Cir.1986) (statistical proof not required if employee offers evidence "to show that a facially neutral policy must in the ordinary course have a disparate impact on a protected group of which an individual plaintiff is a member") (quoting Mitchell v. Bd. of Trs. of Pickens Cty., 599 F.2d 582, 585 n.7 (4th Cir. 1979)).

47

The Court has reviewed the record and sees neither statistical nor any other type of evidence to suggest disparate impact.  This is because Epps's facially neutral policy adversely affects any CSR who wants to wear something other than the mandated uniform.  It impacts, for example, CSRs who want to wear caps in support of their favorite sports teams.  If plaintiff had evidence that when a CSR objected to the uniform policy, Epps offered transfers only to those who wanted to wear religious garb, but not to those who wanted to wear a cap, then she might be able to proceed.  See, e.g., Muhammad v. N.Y.C. Transit Auth., 52 F. Supp. 3d 468, 485-86 (E.D.N.Y. 2014) (plaintiff established prima facie disparate impact case by showing that defendant's policy of transferring persons with religious objections to its uniform policy to a bus depot disproportionately affected members of plaintiff's protected class, when evidence showed that four Muslim women and a Sikh man were transferred out of passenger service for violating the headwear portion of the defendant's uniform guidelines, while no employees who violated the headwear policy for secular reasons were transferred, although there were at least 64 such violations between 2003 and 2005).  However, there is no such evidence.

Given plaintiff's failure to exhaust administrative remedies on her disparate impact claim, and given the lack of any probative evidence of disparate impact in the record now before the Court, the undersigned **RECOMMENDS** that

48

defendant's Motion for Summary Judgment be **GRANTED** on plaintiff's disparate impact claim (Count V).

## IV.   CONCLUSION

For the reasons detailed above, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment on her Discharge (Count II) and Retaliation (Count IV) Claims [23] be **DENIED**, and **FURTHER RECOMMENDS** that Defendant's Motion for Summary Judgment [26] as to all of plaintiff's claims be **GRANTED**.

Plaintiff's Motion to Exclude Paragraph 4 of Kelley Griffith's Affidavit [35] is **DENIED AS MOOT**.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

**SO ORDERED AND RECOMMENDED**, this 22nd day of August, 2017.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE